

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.H. | ) | |
| | ) | |
| JUVENILE OFFICER, | ) | WD77850 |
| | ) | |
| Respondent, | ) | OPINION FILED: |
| v. | ) | |
| | ) | March 8, 2016 |
| J.L.H., | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable John M. Torrence, Judge**

**Before En Banc Division:**
**Alok Ahuja, Chief Judge, Victor C. Howard, Thomas H. Newton,**
**Lisa White Hardwick, James Edward Welsh, Mark D. Pfeiffer,**
**Karen King Mitchell, Cynthia L. Martin, Gary D. Witt,**
**Anthony Rex Gabbert, Judges, and Joseph M. Ellis, Senior Judge[1]**

J.L.H. appeals a juvenile court adjudication on a motion to modify a prior order of disposition, finding that he would have been found guilty if tried as an adult of violating section 571.080 (transfer of a concealable firearm without a permit).[2] J.L.H. contends that the juvenile court committed reversible error when it denied a

---

[1] Judge Ellis retired as an active member of the court on February 29, 2016, after oral argument in this case. He has been assigned by the Chief Justice to participate in this decision as Senior Judge.

[2] Statutory references are to RSMo (2000), as updated by cumulative supplement, unless otherwise indicated.

motion to suppress his statement to the police in response to custodial interrogation conducted in violation of section 211.059.  We agree and reverse.

This appeal requires us to resolve an issue of first impression.  We must decide whether the narrow public-safety exception recognized in *New York v. Quarles*, 467 U.S. 649 (1984), to the obligation to give *Miranda*[3] warnings should be read by implication into section 211.059, a Missouri statute that expressly addresses a juvenile's rights during custodial interrogations.[4]

## Factual and Procedural Background

Based on a tip about an individual with a gun relayed by a parking attendant and security dispatcher at the Country Club Plaza in Kansas City, Missouri, uniformed, off-duty police officers who were working as Plaza security began following J.L.H. in late April 2014.  He stood out from the group of young people he was with because he was wearing a yellow hoodie, which had been an identifying characteristic of the tip, and he began walking away from the group after he was spotted.  When ordered to stop, J.L.H. began to run. He was apprehended after a chase that ended as he stopped and lay down at the bottom of a hill along Brush Creek in response to a command to show his hands.  He was handcuffed, frisked, and lifted onto a retaining wall, and  held by one of the officers.  After about five to eight minutes, he was walked up the hill from the creek surrounded by several officers and was asked where he threw the gun.  Before asking the question, the officers did not

---

[3]*Miranda v. Ariz.*, 384 U.S. 436 (1966).

[4] In this regard, we emphasize that our decision is wholly based on the need to discern legislative intent in the absence of statutory text incorporating constitutional jurisprudence or the public-safety exception.  To the extent that the dissent focuses on constitutional precepts as well as principles derived from search-and-seizure case law, we suggest that analysis should not be followed.

provide the warnings to J.L.H., who was known to one of them, as required under *Miranda*[5] and section 211.059.1, including his right to remain silent and the consequences of making an incriminating statement.[6]

Searching for the weapon, other officers who had been canvassing the area, found a handgun in a bush where J.L.H. said he had thrown it. Officer William Thompson who actually found the gun, a semi-automatic, .40 caliber Glock pistol with six live rounds, testified during the adjuducation hearing that he knew to look for it in a bush along Brush Creek because he was "doing an area canvass, just looking everywhere."[7]

The juvenile officer filed a motion to modify, alleging that J.L.H. "violated Section 571.080 RSMo by knowingly possessing, in Jackson County, Missouri, a concealable handgun, a Smith and Wesson [sic] Glock Pistol and by possessing, in Jackson County, Missouri, ammunition that is suitable for use only in a handgun, approximately 6 live rounds loaded in the Glock Pistol."[8] J.L.H. filed a motion to

---

[5] The constitutional right to which the *Miranda* warnings apply was extended to juveniles under *In re Gault*, 387 U.S. 1 (1967).

[6] Whether J.L.H. was in custody when he was asked where he threw the gun is not in dispute. He had been handcuffed and was surrounded by several officers when questioned.

[7] The juvenile officer argues that "[i]t was not until J.L.H. told Officer Hill where the gun was located that Officer Thompson recovered the gun in the bushes" and directs the court to the testimony of Sergeant Pegg, who was Officer Thompson's partner that evening. Sergeant Pegg stated that they had found the gun by backtracking the foot pursuit, not because they found it where J.L.H. said he had thrown it. In this regard, he testified:

> I knew that a gun had been found. My partner had found a gun in a bush along the line. We, basically, what we do in any foot pursuit is we always backtrack and kind of walk back the route that we ran to see if anybody – you know, if they dropped anything. And he found a gun in a bush right by – right after – when you go down the hill, right as you go down the hill and you start to head west towards the water, it was right there in the first bush, so –

[8] Smith and Wesson and Glock are separate firearms manufacturers. The record is not entirely clear as to which manufacturer produced the weapon in this case.

suppress the statement to the police about the handgun's location and orally amended the motion to specifically allege a violation of section 211.059. The police officers involved in the chase and search for the handgun testified to the facts set forth above during the suppression hearing. The juvenile court denied J.L.H.'s motion to suppress the statement about the handgun's location, finding that the "tip was not anonymous or unreliable, the stop was justified and the question asked of the juvenile does fall within the public safety exception." J.L.H.'s statement to the police was admitted over objection during the adjudication hearing. Following the adjuducation hearing, the juvenile court sustained the juvenile officer's allegation, committed J.L.H. to the custody of the director of Family Court Services, and suspended the commitment, placing J.L.H. in his grandmother's custody where he had been since a 2009 disposition. Other than the statement that J.L.H. made about the handgun, no additional evidence had been introduced to prove that the recovered handgun had been in his possession. J.L.H. was fourteen years old when the custodial interrogation took place.

**Legal Analysis**

**Custodial Interrogation of a Juvenile**

In the first point, J.L.H. argues that the juvenile court committed reversible error when it overruled the motion to suppress his statement to officers and later admitted that statement over objection because his statement was obtained during a custodial interrogation that violated section 211.059. We review a trial court's denial of a motion to suppress by considering both the suppression hearing and trial evidence "to determine whether sufficient evidence exists in the record to support the

4

trial court's ruling." *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011). We defer to the trial court's credibility determinations and factual findings, asking "only whether the decision is supported by substantial evidence." *Id.* (internal quotation marks omitted). We reverse for clear error. *Id.* We review questions of law *de novo*. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000).

Section 211.059 provides:

**Rights of children when taken into custody (Miranda warnings).**—

1. When a child is taken into custody by a juvenile officer or law enforcement official, with or without a warrant for an offense in violation of the juvenile code or the general law which would place the child under the jurisdiction of the juvenile court . . . , the child shall be advised prior to questioning:

    (1) That he has the right to remain silent; and
    (2) That any statement he does make to anyone can be and may be used against him; and
    (3) That he has the right to have a parent, guardian or custodian present during questioning; and
    (4) That he has a right to consult with an attorney and that one will be appointed and paid for him if he cannot afford one.

2. If the child indicates in any manner and at any stage of questioning pursuant to this section that he does not wish to be questioned further, the officer shall cease questioning.

The State has not contested that J.L.H. was not given the warnings specified in section 211.059.1 before making statements concerning the handgun's location. The State argues, however, that the statutory warnings were not required, because the circumstances fell within the scope of the "public safety" exception recognized in *New York v. Quarles*, 467 U.S. 649 (1984). We reject the State's contention that we can read an unstated "public safety" exception into the mandatory provisions of

5

section 211.059.1.[9]

In *Quarles*, an adult defendant arrested on suspicion of rape was not Mirandized before he was asked to reveal the location of a handgun after he was handcuffed and in custody.[10]  467 U.S. at 652.  The Court recognized that the "Fifth Amendment guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'"  *Id*. at 654.  The Court recognized that *Miranda* "extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police."  *Id*.  The Court also recognized that "[r]equiring Miranda warnings before custodial interrogation provides 'practical reinforcement' for the Fifth Amendment right."  *Id*. (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)).  In short, "the prophylactic Miranda warnings therefore are 'not themselves rights protected by the Constitution.'"  *Id*. (quoting *Tucker*, 417 U.S. at 444).  Based on this analysis, the Court ruled that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's

---

[9] The State's argument assumes that the U.S. Supreme Court would hold that the *Quarles's* public-safety exception applies wholesale to the interrogation of juveniles.  The State's and dissent's confident assumption that *Quarles* would be applied to juveniles without qualification may be open to question. Slip op. at 5. The U.S. Supreme Court has consistently distinguished between adults and juveniles in addressing constitutional rights and protections, recognizing that juveniles are, simply stated, different from adults.  *See, e.g., J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2404 (2011) (summarizing the concerns addressed by the U.S. Supreme Court since the mid-1900s about a juvenile's limited capacity to exercise mature judgment, and elaborating on a "'history [that] is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults") (citation omitted)).  Similar observations about the different capacities of juveniles subject to questioning while in custody appear even earlier in *In re Gault*, 387 U.S. 1, 44-55 (1967).

Because we conclude that statutory protections afforded juveniles by the Juvenile Code are to be applied and interpreted independently of constitutional counterparts, and because we conclude that the *Quarles's* public-safety exception cannot be read by implication into section 211.059 based on settled principles of statutory construction, we need not resolve the question whether *Quarles* even applies to juvenile custodial interrogations.

[10] The victim in *Quarles* had reported to police that her rapist had a gun and had entered a nearby supermarket before being apprehended.  467 U.S. at 651-52.

6

privilege against self-incrimination." *Id.* at 657. As such, the Court recognized "a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence." *Id*. at 655. The effect of the exception is to qualify when *Miranda* warnings must be given.

Although *Quarles* recognized a public-safety exception as a matter of constitutional law, section 211.059 must be interpreted independently of federal constitutional decisions. It is well-established that the General Assembly has the authority to provide greater protections than the federal constitution requires. *See, e.g., State ex rel. J.D.S. v. Edwards*, 574 S.W.2d 405, 409-10 (Mo. banc 1978). Plainly, the General Assembly did just that, and purposefully so, when it enacted section 211.059. Section 211.059 independently addresses important rights that the General Assembly desired to afford juveniles, notwithstanding that those rights have parallel constitutional origins. In at least one important respect, section 211.059 gives *broader* rights to juveniles during custodial interrogations than the rights given under *Miranda* and its progeny: under subsection 211.059.1(3), a juvenile must be advised "[t]hat he has the right to have a parent, guardian or custodian present during questioning." *Miranda* and its progeny do not require such a warning. Indeed, in requiring that juveniles be advised that they have a right to have an adult present during questioning, the General Assembly rejected the approach taken by the Missouri Supreme Court in *In re A.D.R.*, 603 S.W.2d 575 (Mo. banc 1980). *A.D.R.* abrogated *In re K.W.B.*, 500 S.W.2d 275, 283 (Mo. App. 1973), where the court of appeals held that **constitutional** principles require a juvenile in custody to "be given an opportunity to consult with his parents, guardian, adult friend, or attorney as to

7

whether he wishes to waive [his] rights." Obviously, section 211.059 expressly affords juveniles those very rights, deemed lacking as a matter of constitutional law by *In re A.D.R.* This demonstrates that, in enacting section 211.059, the General Assembly recognized that the Juvenile Code permissibly operates independently of constitutional protections (so long as not more restrictive than constitutional protections).

In closely related contexts, the Missouri Supreme Court has recognized that the Juvenile Code operates independently from federal constitutional principles, even when the code and the constitution address the same issues. Thus, in *State v. Arbeiter*, 408 S.W.2d 26 (Mo. 1966), the Missouri Supreme Court considered whether a juvenile's rights had been violated when the juvenile was interrogated for an extended period of time without being promptly turned over to juvenile authorities or advised of his right to counsel. The supreme court did ***not*** rely on *Gallegos v. State of Colorado*, 370 U.S. 49, 55 (1962), a federal constitutional-law decision, to find reversible error, but instead relied solely on the failure to strictly and literally comply with section 211.061, a provision that requires juveniles to be brought promptly before the juvenile court for a detention hearing during which the juvenile and his or her custodian or parent are to be advised of the juvenile's right to counsel. *Arbeiter*, 408 S.W.2d at 31. Our supreme court observed that, because it had found a violation of statutory protections afforded the juvenile under the Juvenile Code, "we do not reach the formidable constitutional objections to the use of the defendant's statements in this case." *Id.* (citing *Gallegos*, 370 U.S. 49).

8

In *In re Gault*, 387 U.S. 1, 41 (1967), the U.S. Supreme Court held that "the Due Process Clause of the Fourteenth Amendment" affords juveniles in "delinquency proceedings which might result in commitment to an institution" the right to be represented by counsel. When *Gault* was decided, however, the Missouri General Assembly had already adopted section 211.211[11] similarly affording juveniles the right to counsel. After *Gault*, when our supreme court considered a juvenile's right to counsel in *In re D.J.M.*, 259 S.W.3d 533 (Mo. banc 2008), the court did ***not*** rely on *Gault* to find reversible error, but instead relied solely on the trial court's failure to strictly and literally comply with section 211.211. *Id.* at 536. Our supreme court observed that it did not need to address D.J.M.'s constitutional right to counsel, "because D.J.M. was not provided his statutory right to counsel pursuant to section 211.211." *Id.*; *see also State v. Burris*, 32 S.W.3d 583, 589 (Mo. App. S.D. 2000) ("The right of a child to be advised that he or she has a right to have a parent, guardian or custodian present during questioning is derived from § 211.059.1(3), a statutory provision that is part of this state's juvenile code, rather than from the *Miranda* interpretation of a suspect's constitutional rights.").

We are required, therefore, to view and apply section 211.059 distinctly from its constitutional counterpart, just as the Missouri Supreme Court did with respect to sections 211.061 and 211.211 in *Arbeiter* and *D.J.M.* Accepting that premise leads to the inescapable realization that the General Assembly enacted section 211.059 because it intended to define a juvenile's rights in advance of custodial interrogations by statute, independently of constitutional protections. Indeed, though section

---

[11] Section 211.211 was first enacted in 1957.

211.059 includes required warnings similar to *Miranda*, it also includes the right to have a parent, guardian, or custodian present during any custodial interrogation. J.L.H.'s first point presents a question of statutory interpretation, not a question of constitutional law. While the U.S. Supreme Court may have recognized a "public safety" exception to the warnings required by *Miranda*, the question we address is different: is there a public-safety exception to the warnings required by section 211.059? The answer to this latter question is plainly "no."

Section 211.059 does not, in express terms, include a "public safety" exception. Instead, the statute states, in mandatory terms and without qualification, that "[w]hen a child is taken into custody by a juvenile officer or law enforcement official . . . for an offense in violation of the juvenile code or the general law[,] . . . the child **shall be advised** [of the specified rights] prior to questioning . . . ." (Emphasis added.) Under bedrock principles of statutory construction, we cannot incorporate unwritten conditions, exceptions, or limitations into section 211.059's unambiguous command. The Missouri Supreme Court has emphasized that "'[t]his Court may not engraft upon the statute provisions which do not appear in explicit words or by implication from othe[r] words in the statute." *State v. Collins*, 328 S.W.3d 705, 709 n.6 (Mo. banc 2011). Courts "cannot supply what the legislature has omitted from controlling statutes"; instead, we "enforce[ ] statutes as they are written, not as they might have been written." *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 668 (Mo. banc 2010). Under these fundamental principles, *"[w]here no exceptions are made in terms, none will be made by mere implication or*

10

*construction*." *McGhee v. W.R. Grace & Co.*, 312 S.W.3d 447, 455 (Mo. App. S.D. 2010) (citations omitted).

In addition, the General Assembly "is presumed to have acted with a full awareness and complete knowledge of the present state of the law, including judicial and legislative precedent." *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 259 S.W.3d 23, 31 (Mo. App. W.D. 2008); *see also Turner*, 318 S.W.3d at 668. Section 211.059 was enacted five years after *Quarles* was decided. We must presume, therefore, that the General Assembly was aware of the existence of the public-safety exception to the obligation to give *Miranda* warnings when it enacted section 211.059. Yet it did not include a public-safety exception in the statute.

Finally, in construing legislation, we presume that the Legislature does not enact laws without a reason. "'[T]he legislature will not be charged with having done a meaningless act.'" *Stiers v. Dir. of Revenue*, No. SC94840, 2016 WL 143230, at *5 (Mo. banc Jan. 12, 2016) (quoting *State v. Swoboda*, 658 S.W.2d 24, 26 (Mo. banc 1983)). Before section 211.059 was enacted, the U.S. Supreme Court had declared in *Gault* that "the [Fifth Amendment] constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults." 387 U.S. at 55. By then, *Miranda* had already been decided.[12] Yet, in 1989, twenty-two years after *Gault*, our General Assembly enacted section 211.059. Section 211.059 requires warnings similar to—but broader than—those required under *Miranda* and *Gault*. Codification of a juvenile's right to receive *Miranda* warnings, however, would have been an unnecessary act, if the State is correct that section 211.059 codified the entirety of the U.S. Supreme Court's *Miranda* jurisprudence.

---

[12] The U.S. Supreme Court decided *Miranda* in 1966.

11

We accordingly conclude that law enforcement officers were required to give J.L.H. the warnings specified in section 211.059 before engaging him in a custodial interrogation; the statutory requirement that these warnings be given is not excused, even if the circumstances fell within *Quarles'* "public safety" exception.

Missouri courts have not previously addressed the consequence should a statement be elicited from a juvenile in violation of section 211.059. The Missouri Supreme Court has, however, concluded that violations of similar Juvenile Code provisions constitute reversible error.

In *State v. Arbeiter*, 408 S.W.2d 26, 29 (Mo. 1966), a juvenile accused of first-degree murder was interrogated in violation of section 211.061, which required that a juvenile, once taken into custody, be taken "immediately and directly before the juvenile court," or be delivered "to the juvenile officer or person acting for him." Having determined that a statutory violation occurred, the Missouri Supreme Court observed that "[t]he question remains as to the effect of noncompliance with section 211.061." *Id.* The court held that "the absence of express statutory sanction against police procedures in violation of the Juvenile Code does not require that such violations be excused or ignored." *Id.* The court examined the rationale the Arizona Supreme Court employed to address violations of a similar "right to counsel" statute. *Id.* at 29-30 (citing *State v. Shaw*, 378 P.2d 487 (Ariz. banc 1963)). Though lengthy, that rationale is instructive and is set forth in full:

> The philosophy which inspired creation of the juvenile court, and statutes implementing it, is that the state recognizes that in the majority of cases involving antisocial behavior (including criminal offenses) on the part of the youthful offenders, there is both a responsibility and an opportunity for the state, through special treatment in a non-criminal proceeding, to redirect and rehabilitate these young people. This

12

operates for the benefit of the individual, and for society as a whole. However, in many states, as in Arizona, it is also recognized that there are certain individuals still within the chronological classification as juveniles, for whom this special treatment is futile. The juvenile court therefore may refuse to continue its jurisdiction in such cases, and may remand these individuals for regular proceedings in the criminal court. Under the law in Arizona, until the juvenile court, which has exclusive jurisdiction of all delinquent children or children accused of crime, has considered the matter and decided that the particular individual is not one who will benefit from its special treatment, a child offender remains in the juvenile jurisdiction.

While under the juvenile court jurisdiction, a child is under certain disabilities not attaching to an adult. He is not entitled to be released on bail; he does not have the right of trial by jury, or right of compulsory process to compel the attendance of witnesses on his behalf guaranteed by the Arizona Constitution in criminal prosecutions. To compensate for some of these disabilities, the juvenile statutes provide that the juvenile probation officer shall act as a representative in his behalf, and further that if he is arrested by a peace officer, such officer 'shall forthwith notify the probation officer, and shall make such disposition of the juvenile as the probation officer directs.'

The need for special treatment begins at the instant the juvenile is contacted by peace officers and this was recognized by the legislature. A few hours of the treatment sometimes accorded mature and hardened criminals can give the impressionable mind of a youth an indelibly warped view of society and its interest in him.

Unquestionably, the purpose of A.R.S. [section] 8—221 was to alter the usual method of handling persons arrested on suspicion or for investigation of criminal activities when those persons are juveniles. Moreover, it is apparent that this alteration of methods was intended to protect the interests of juveniles rather than to facilitate police investigations. Since a major feature of the usual treatment of newly arrested persons is interrogation, it follows that one of the purposes of A.R.S. [section] 8—221 is to protect the juvenile from the adverse effects of this procedure.

We have carefully considered the possible means of enforcing the policy expressed in A.R.S. [section] 8—221 and have concluded that the means most in harmony with the purposes expressed and implicit in that section is to preclude the admission of statements obtained by the persuasion of police during the period when the section is being violated.

13

*Id*. at 30 (quoting *Shaw*, 378 P.2d at 491-93).

The Missouri Supreme Court adopted the Arizona Supreme Court's rationale in its entirety:

> In our opinion, this conclusion is entirely consistent with the philosophy of our Juvenile Code. While we recognize the interest of society in the protection of its members against criminal activity, the Juvenile Code recognizes that at the juvenile level, the problem is best proceeded against on a rehabilitative basis under special procedures for the benefit of the child. If our experience shows that the special procedures for the benefit of juveniles are producing results adverse to the best interests of society, then the legislative authority may resort to different procedures. In the meantime we feel obligated to construe and apply the Juvenile Code as the Arizona court did, 'to protect the interests of juveniles rather than to facilitate police investigations.'

*Id*. at 30-31. Our supreme court then concluded that the statement elicited from the juvenile in violation of section 211.061 was inadmissible, requiring reversal and remand of the case for a new trial.[13] *Id*. at 31.

In *State v. Wade*, 531 S.W.2d 726, 728-29 (Mo. banc 1976), the Missouri Supreme Court reiterated the holding that failure to strictly and literally comply with section 211.061 constitutes reversible error. The court stated, "The Juvenile Code intends that no statement shall be made to police by a person [younger than] seventeen years of age before the child is taken to juvenile authorities. To hold the statement admissible here would permit the State to obtain and use what the Code refuses." *Id*. at 729. Acknowledging the incapacities of juveniles, the court determined that the Juvenile Code:

> recognizes the incapacities of persons [younger than] seventeen years of age, and intends that a child shall be provided with the assistance of a

---

[13]A new trial was ordered because the Supreme Court "[could] not conclude on the record . . . that it would be impossible for the prosecution to make a submissible case against the appellant without the use of his statements." *Arbeiter*, 408 S.W.2d at 31.

14

juvenile officer or other juvenile court personnel before he is subjected to the rigors of police interrogation. We doubt the capacity of an offender [younger than] seventeen years of age to legally effect a waiver of any kind in the absence of such a person.

*Id.* at 728-29.[14]

The Missouri Supreme Court used an identical rationale in *In re D.J.M.*, 259 S.W.3d 533 (Mo. banc 2008), a case addressing the violation of a juvenile's statutory right to the counsel as provided in section 211.211. As with section 211.061, section 211.211 does not express a consequence for its violation. The supreme court observed that, "[b]ecause of the importance of the right to counsel to the fairness of the proceedings [for a juvenile], there must be strict and literal compliance with the statutes affecting this right, and failure to strictly comply results in reversible error." *Id.* at 535 (citing *In re C.W.*, 211 S.W.3d 93, 97-98 (Mo. banc 2007) (holding that trial court's failure to strictly comply with section 211.455, requiring the submission of an investigation and social study after juvenile petition, was reversible error), *abrogated on other grounds by In re B.H.*, 348 S.W.3d 770 (Mo. banc 2011)). Thus, the supreme court held that, because "[t]he trial court did not strictly comply with section 211.211 when it failed to appoint counsel for D.J.M. without a full record supporting waiver of his right to counsel or representation of D.J.M. by other counsel in the case who was not subject to a conflict of interest[,] . . . [the] noncompliance results in reversible error." *Id.* at 536. The court reversed the juvenile's conviction. *Id.*

---

[14] As part of its argument that Fourth Amendment exclusionary rule principles should apply here, the dissent argues that police officers should not be required to ascertain a suspect's age before questioning. In this regard the dissent states, "[T]here is nothing in the record indicating that Sergeant Williams knew that J.L.H. was a juvenile." Slip op. at 12. Yet, in *State v. Wade*, 531. S.W.2d 726, 729 (Mo. banc 1976), our supreme court held that statements obtained in violation of section 211.061 should have been excluded *even though the juvenile had misrepresented his age.*

15

Here, the State has not contested that J.L.H.'s statement was elicited during a custodial interrogation which was not preceded by the section 211.059 warnings. Section 211.059 requires a juvenile to be notified of his right to counsel, similar to section 211.211. Section 211.059 prohibits interrogations of a juvenile without advising the juvenile of the right to have a parent, guardian, or custodian present. *See Wade*, 531 S.W.2d at 729 (expressing doubt that a juvenile offender can "legally effect a waiver of any kind in the absence of" the assistance of a juvenile officer). The important protections afforded by sections 211.061 and 211.211 are qualitatively indistinguishable from the protections provided juvenile offenders by section 211.059. The rationale that the Missouri Supreme Court so carefully examined and explained in *Arbeiter*, *Wade*, and *D.J.M.* with respect to the consequence of failing to strictly and literally comply with the Juvenile Code's provisions is equally applicable here. Thus, though section 211.059 does not express a consequence for its violation, analogous Missouri Supreme Court precedent directs that the failure to strictly and literally comply with section 211.059 rendered J.L.H.'s statement inadmissible.[15] The

_____

[15] The dissent argues that "[h]ad the legislature wished to expressly . . . exclude the usage of statements obtained in violation of section 211.059, it could have done so," relying on section 211.271.3. Slip op. at 8 n.5. That statute does not aid the dissent; it establishes that statements a child makes to a juvenile officer after the child is taken into custody "are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, *other than proceedings under this chapter.*" § 211.271.3 (emphasis added). The statute does not "exclude" a juvenile's statements in juvenile proceedings—it expressly authorizes their use in such proceedings. More to the point, unlike sections 211.059, 211.061, and 211.211, section 211.271.3 does not describe procedures that must be followed in juvenile matters to protect the juvenile's rights. Instead, section 211.271 addresses the effect of juvenile court proceedings on a juvenile's civil rights in other contexts and cases. It is in this context that the state precludes the use of the statements a juvenile makes to a juvenile officer against the juvenile in proceedings other than those pursued under the Juvenile Code. In so providing, the Legislature did not prescribe a "remedy" or "consequence" for a section 211.271 violation.

We would also note that a similar argument was made and expressly rejected in *Arbeiter*. After recognizing that section 211.271.3 was literally not applicable to the case, our supreme court still held that exclusion of the statement obtained in violation of section 211.061 was appropriate. 408 S.W.2d at 29. It was in this context that the court stated, "[T]he absence of express statutory

16

juvenile court's denial of J.L.H.'s motion to suppress his statement to authorities during an unlawful custodial interrogation, and the juvenile court's subsequent admission of the statement during J.L.H.'s adjudication hearing over J.L.H.'s objection, constitute reversible error.[16]

When section 211.059 was enacted, the General Assembly was aware of the Missouri Supreme Court's compelling analysis in *Arbeiter* and *Wade* ascribing to the General Assembly a particular rationale in adopting the Juvenile Code. When section 211.059 was enacted, the General Assembly was aware of the consequences our supreme court had imposed in *Arbeiter* and *Wade* for failure to strictly and literally comply with Juvenile Code provisions affording important protections to juveniles.

---

sanction against police procedures in violation of the Juvenile Code does not require that such violations be excused or ignored." *Id.*

[16] The dissent, for the sake of argument, "accepts that J.L.H.'s rights were violated under section 211.059," slip op. at 7, but argues that those rights should be subject to the judicially created exclusionary rule, and thus to an analysis of "whether the purposes of the exclusionary rule would be served by applying it to statements obtained from juveniles in violation of section 211.059." Slip op. at 9. This argument ignores the critical fact that we are not addressing a constitutional violation in this case. We are addressing a statutory violation. The dissent cites no authority for applying the exclusionary rule to determine the consequences of a statutory violation merely because the statute affords rights that parallel or exceed constitutional rights. In fact, in *McNabb v. U.S.*, 318 U.S. 332, 340 (1943), the case the dissent relies on to suggest that the exclusionary rule applies to Fifth Amendment violations, slip op. at 9, the U.S. Supreme Court expressly held that because Congress had enacted a statute addressing interrogations, it need not "reach the Constitutional issue pressed upon us." Instead, the U.S. Supreme Court concluded that "[q]uite apart from the Constitution, . . . we are constrained to hold that the evidence elicited from the petitioners . . . must be excluded. For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them." *McNabb,* 318 U.S. at 341-42. Importantly, using a rationale that is indistinguishable from that our supreme court used in *Arbeiter, Wade*, and *In re D.J.M.*, the U.S. Supreme Court held:

> Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in wilful disobedience of the law. ***Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law.***

*Id*. at 345 (emphasis added) (note that the U.S. Supreme Court recognized that Congress had subsequently acted to limit, but had not eliminated, the rule in *McNabb* in *Corley v. U.S.* 556 U.S. 303, 306 (2009)).

17

When section 211.059 was enacted, the General Assembly was aware that *Arbeiter* acknowledged and honored the distinct origin of statutory protections afforded juveniles while expressly declining to address comparable constitutional protections. Against this backdrop, the General Assembly would necessarily have appreciated that in enacting section 211.059, the rights therein afforded juveniles would be determined independently of parallel constitutional rights and that a failure to strictly and literally abide by section 211.059 would constitute reversible error. Thus, we are required to view the General Assembly's failure to include an express public-safety exception in section 211.059 as a purposeful omission. "[W]e must interpret and apply [section 211.059] as written. . . . It is not our prerogative to question the wisdom of the legislature in enacting" the statute without a public-safety exception. *In re K.C.M.*, 85 S.W.3d 682, 694 (Mo. App. W.D. 2002) (citations omitted), *abrogated on other grounds by In re M.D.R.*, 124 S.W.3d 469 (Mo. banc 2004).

Our conclusion is further reinforced by the fact that when section 211.059 was enacted, the General Assembly knew that *Arbeiter* addressed the precise tension which now underscores the State's request to imply a public-safety exception. In *Arbeiter*, the Missouri Supreme Court resolved the tension between public safety and the special procedures that the Legislature had adopted to benefit juveniles in favor of protecting juveniles. As noted above, the supreme court stated:

> While we recognize the interest of society in the protection of its members against criminal activity, the Juvenile Code recognizes that at the juvenile level, the problem is best proceeded against on a rehabilitative basis under special procedures for the benefit of the child. ***If our experience shows that the special procedures for the benefit of juveniles are producing results adverse to the best interests of society, then the legislative authority may resort to different procedures.*** In the meantime, we feel obligated to construe and apply the Juvenile Code as

18

the Arizona court did, "to protect the interests of juveniles rather than to facilitate police investigations."

*Arbeiter*, 408 S.W.2d at 30-31 (emphasis added). We cannot disregard that, despite knowledge that its Juvenile Code provisions would be interpreted to resolve public-safety concerns in favor of protections afforded juveniles, the General Assembly did not include a public-safety exception when it enacted section 211.059.

In summary, we conclude that the General Assembly knew when it enacted section 211.059 that a statement obtained from a juvenile in violation of section 211.059 would result in reversible error if admitted into evidence over proper objection. We necessarily conclude, therefore, that the General Assembly's failure to express a public-safety exception in section 211.059 was purposeful. We will not rewrite a plain and unambiguous statute to imply an unexpressed term. *Jackson v. Wilson*, 581 S.W.2d 39, 44 (Mo. App. W.D. 1979) (holding that court should abstain from "rewriting a statute under the guise of construing it").[17]

---

[17] As for the other states that have adopted warnings in one form or another for juveniles caught up in delinquency proceedings, unlike in Missouri, at least six of the thirteen the dissent has identified saw fit to expressly incorporate a reference to the larger body of constitutional jurisprudence. Slip op. at 13 n.9. For example, under a subsection titled "Rights of juveniles," New Jersey law provides, "All rights guaranteed to criminal defendants by the Constitution of the United States and the Constitution of this State, except the right to criminal indictment, the right to trial by jury and the right to bail, shall be applicable to cases arising under this act." N.J. Rev. Stat. § 2A:4A-40 (1983). New Hampshire requires the court at any arraignment to "[i]nform the minor of the applicable constitutional rights." N.H.Rev. Stat. Ann. § 169-B:13 (2011). Washington requires that juveniles be advised of their rights when appearing in court and specifically states, "A juvenile shall be accorded the same privilege against self-incrimination as an adult. An extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding may not be received in evidence at an adjudicatory hearing over objection." Wash. Rev. Code § 13.40.140(8) (2014). And in Kansas and Montana, reference is expressly made to a youth's "right against self-incrimination" in the context of statements made while in custody. Kan. Stat. Ann. § 38-2333(a) (2007); Mont. Code Ann. § 41-5-331(1)(a) (2009). There are any number of ways to expressly incorporate constitutional jurisprudence. Our Legislature chose not to do so.

What other states have concluded on the issue is not binding on this Court, and it is particularly telling that just thirteen have apparently adopted the warnings our Legislature adopted when it enacted section 211.059. This is clearly a matter of constituent preference and legislative deliberation rather than a wholesale adoption of more limited federal guarantees. The few state

19

Therefore, we reject the State's argument that its admitted violation of section 211.059 should be excused by the public-safety exception. Section 211.059 warnings and advisements are mandatory, and statements secured from a juvenile in violation of the statute will result in reversible error if admitted into evidence. J.L.H.'s statement to the police during a custodial interrogation, and in violation of section 211.059, was inadmissible. The juvenile court committed reversible error by failing to sustain J.L.H.'s motion to suppress the statement and by admitting the statement into evidence over objection during J.L.H.'s adjudication hearing. Because J.L.H. self-incriminatory statement was the only evidence introduced to prove an essential element of the juvenile officer's allegation, J.L.H.'s adjudication and disposition must be reversed. *See State v. Larson*, 623 S.W.2d 69, 73 (Mo. App. W.D. 1981) (court reversed juvenile's conviction of possession of nonintoxicating beer by a minor because sheriff who had him in custody did not give him full *Miranda* warnings before asking him his age and minor's answer was the only evidence presented to prove an essential element of the crime).

Our conclusion recognizes the perils that the Juvenile Code is intended to protect against—that children are particularly vulnerable to the coercive effects of police custody. We would be tilting the delicate separation-of-powers balance by

---

courts that have applied the public-safety exception to juveniles either have no comparable statutory protections or did so peremptorily, without considering how doing so fit within the juvenile justice statutory framework or whether it comported with legislative intent as we do here. *See In re Cy R*, 841 N.Y.S.2d 25, 28, 43 A.D.3d 267, 2007 N.Y. Slip Op. 06335 (N.Y. App. Div. 2007) (ruling that inquiry about location of weapons fell within *Miranda's* public-safety exception, without acknowledging or addressing statutory warnings that do not expressly include it), *cert. denied*, 128 S. Ct. 1891 (2008).

reading an unexpressed public-safety exception into section 211.059.[18] That would amount to legislating rather than adjudging, which "we are forbidden to do." *State v. Jones*, 172 S.W.3d 448, 457 (Mo. App. W.D. 2005), *overruled on other grounds by State v. Claycomb*, 470 S.W.3d 358 (Mo. banc 2015). If the General Assembly wishes to change section 211.059, it is free to do so. *Arbeiter*, 408 S.W.2d at 30-31. In the meantime, law enforcement motivated by exigent public-safety concerns remain free to act on those concerns by making urgent inquiry of a juvenile in custody. If, however, a statement secured from a juvenile in the process violates section 211.059, the statement will not be admissible in a subsequent criminal proceeding involving the juvenile. *Id.* That resolution is wholly consistent with the Juvenile Code's purpose.

J.L.H.'s first point on appeal is granted. Because we reverse the adjudication, we do not address his remaining points, whether the statement was inadmissible because the police lacked probable cause to place him in custody or whether the State introduced sufficient evidence to prove J.L.H.'s age.

---

[18] We remind that whether the *Quarles* public-safety exception will be interpreted to apply to juveniles remains an unresolved constitutional question, contrary to the dissent's assertion. *See* footnote 8 above.

21

## Conclusion

We reverse the juvenile court's adjudication and disposition, finding that it erred in overruling J.L.H.'s motion to suppress.

/s/ THOMAS H. NEWTON
Thomas H. Newton, Judge

Thomas H. Newton, Judge, writes for the majority. Alok Ahuja, Chief Judge, Lisa White Hardwick, Cynthia L. Martin, Gary D. Witt, Judges, and Joseph M. Ellis, Senior Judge, concur.

Alok Ahuja, Chief Judge, writes in a separate concurring opinion. Cynthia L. Martin, Judge, concurs.

Mark D. Pfeiffer, Judge, writes for the dissent. Victor C. Howard, James E. Welsh, Karen King Mitchell, and Anthony Rex Gabbert, Judges concur.



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

IN THE INTEREST OF: J.L.H.,  )
)
    Appellant,  )
)
  v.  )    **WD77850**
)
JUVENILE OFFICER,  )    FILED: March 8, 2016
)
    Respondent.  )

## CONCURRING OPINION

I join Judge Newton's opinion for the Court.

As Judge Newton's majority opinion explains, the analysis in the dissenting opinion is fundamentally misguided, because this case involves the interpretation and application of a state statute, not the constitutional principles developed in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. And, as the majority opinion discusses, the Missouri Supreme Court has held in multiple cases that where government officers fail to comply with the procedures specified in the Juvenile Code for treatment of detained juveniles, statements obtained from those juveniles must be excluded from the government's case in chief. *See, e.g.*, *State v. Wade*, 531 S.W.2d 726, 729 (Mo. banc 1976); *State v. Arbeiter*, 408 S.W.2d 26, 29-31 (Mo. 1966). Our decision in this case must be guided by Missouri Supreme Court decisions interpreting and applying Missouri's

Juvenile Code, not by decisions of the Supreme Court of the United States interpreting federal constitutional provisions.[1]

I write separately merely to point out that the result would be the same, even if we applied the remedial approach adopted in the *Miranda* cases, as the dissent advocates.

The remedial principle applied in the *Miranda* cases is reasonably straightforward:

o       *if* police officers fail to give *Miranda* warnings in circumstances where those warnings are required,

o       *then* subsequent statements made by a detainee in response to police interrogation are presumed to be coerced, and are inadmissible in the prosecution's case in chief.

The Supreme Court of the United States has stated this fundamental point time and again. Thus, in *Dickerson v. United States*, 530 U.S. 428 (2000), the Court stated that *Miranda*'s "core ruling [was] that unwarned statements may not be used as evidence in the prosecution's case in chief." *Id.* at 443-44. Similarly, in *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court explained that "[a] *Miranda* violation . . . affords a bright-line, legal presumption of coercion, requiring suppression

---

[1]       The dissent argues that *Wade* and *Arbeiter* are distinguishable, because those cases were both criminal prosecutions, not juvenile delinquency proceedings like this case. Section 211.059.1 plainly applies to juvenile proceedings, however, since its warnings must be administered whenever a juvenile is taken into custody "for an offense in violation of the juvenile code or the general law which would place the child under the jurisdiction of the juvenile court pursuant to [§ 211.031.1(2) or (3)]." *Arbeiter* does not limit its discussion to adult criminal proceedings; to the contrary, it proclaims that the "philosophy of our Juvenile Code" is that, "*at the juvenile level*, the problem [of the protection of society from criminal activity] is best proceeded against on a rehabilitative basis *under special procedures for the benefit of the child*." 408 S.W.2d at 30 (emphasis added). More generally, the Missouri Supreme Court has held that the right to counsel and other statutory and constitutional safeguards must be respected in juvenile and other *parens patriae* proceedings, no less than in criminal proceedings. *See, e.g., In re D.J.M.*, 259 S.W.3d 533, 535 (Mo. banc 2008) (recognizing "the right to counsel as a fundamental right, necessary to ensure fairness in criminal proceedings as well as in juvenile delinquency proceedings"; "Because of the importance of the right to counsel to the fairness of the proceedings, there must be strict and literal compliance with the statutes affecting this right, and failure to strictly comply results in reversible error."); *In re N.D.C.*, 229 S.W.3d 602, 605 (Mo. banc 2007) (holding that the constitutional right to confront adverse witnesses applies in juvenile delinquency proceedings; "the constitutional protections applicable in criminal proceedings are also applicable in juvenile delinquency proceedings due to the possibility of a deprivation of liberty equivalent to criminal incarceration"); *In re Link*, 713 S.W.2d 487, 494 (Mo. banc 1986) (guardianship proceeding; "'Where . . . the state undertakes to act in *parens patriae*, it has the inescapable duty to vouchsafe due process . . . [and] due process requires that the infirm person . . . be fully advised of his rights and accorded each of them unless knowingly and understandingly waived.'" (citation omitted)).

of all unwarned statements." *Id.* at 306 n.1. Even Justice Thomas' three-justice plurality opinion in *United States v. Patane*, 542 U.S. 630 (2004), recognizes this basic principle: "To protect against this danger [of violating an arrestee's privilege against self-incrimination], the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." *Id.* at 639.

During oral argument, the Juvenile Officer's counsel acknowledged that she could not identify any case in which the Supreme Court of the United States had held that a detainee's statement was admissible in the government's case in chief, despite law enforcement's failure to give warnings required by *Miranda* and its progeny.

Unlike the Juvenile Officer, the dissent seeks to deny the simple remedial rule applied in the *Miranda* cases, by relying on a hodge-podge of inapposite legal authorities. For example, the dissent cites Fourth Amendment search-and-seizure cases (*Davis v. United States*, 564 U.S. 229 (2011); *Illinois v. Gates*, 462 U.S. 213, 223 (1983)) to argue that the application of the exclusionary rule is separate and distinct from the question whether a defendant's rights have been violated. Similarly, the dissent relies on *Michigan v. Tucker*, 417 U.S. 433 (1974). But in *Tucker*, "[t]he statements actually made by respondent to the police," after he was given incomplete *Miranda* warnings, "were excluded at trial," *id.* at 447-48; the only question in *Tucker* was whether statements made by *another witness* should be excluded, because that witness was identified by police based on the defendant's unwarned statements. *Tucker* does not question *Miranda*'s core holding that the defendant's unwarned statements themselves are generally inadmissible. As a final example, the dissent relies on *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), in which a foreign-national defendant argued that his inculpatory statements should be excluded as evidence in a state criminal trial, because he had not been advised of his

3

right under an international treaty to have consular officials of his home country informed of his detention. But *Sanchez-Llamas* emphasizes that the right of consular notification at issue in that case was wholly different from the rights guaranteed a criminal defendant under *Miranda*:

> The violation of the right to consular notification . . . is at best remotely connected to the gathering of evidence. Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention – not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.

*Id.* at 347. *Sanchez-Llamas* has nothing to do with the exclusionary remedy applied where custodial statements result from a *Miranda* violation.

In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court of the United States held that police are not required to administer *Miranda* warnings in certain exigent circumstances involving threats to the public's safety. *Id.* at 655. Section 211.059.1 contains no similar "public safety" exception, however, and as the majority opinion explains, we cannot – as a matter of Missouri statutory interpretation – write a "public safety" exception into the statute, when such an exception is not contained in the statute's unambiguous text.

Because § 211.059.1 contains no "public safety" exception, officers were required to give J.L.H. the warnings specified in the statute before interrogating him, even assuming that no warnings were required under the *Miranda* cases. The Juvenile Officer concedes that no such warnings were given. The majority opinion then determines the consequences of this statutory violation by applying a remedial analysis similar to that applied in the *Miranda* cases: *if* police officers fail to give the statutory warnings in circumstances where those warnings are required, *then* subsequent statements made by a juvenile detainee in response to police interrogation are

4

presumed to be coerced, and are inadmissible in the government's case in chief. Unlike the dissent, I see no analytical inconsistency between the exclusionary remedy applied by the majority in this case, and the remedy uniformly applied in the *Miranda* caselaw.

_____

Alok Ahuja, Chief Judge



## IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

IN THE INTEREST OF J.L.H.      )
     )
JUVENILE OFFICER,      )
     )
         Respondent,      )    **WD77850**
     )
v.      )    **FILED: March 8, 2016**
     )
     )
J.L.H.,      )
     )
         Appellant.      )

## DISSENTING OPINION

Via judicial construct, the majority opinion today engrafts the exclusionary rule remedy upon section 211.059—which otherwise identifies no such remedy in this Missouri juvenile *Miranda* statute—without heeding the caution of the United States Supreme Court that courts must "maintain the closest possible fit between the Self-Incrimination Clause and any judge-made rule designed to protect it." *United States v. Patane*, 542 U.S. 630, 643 (2004). In so doing, the majority opinion ignores decades of jurisprudence on the topic of the purpose of the exclusionary rule and goes where no court in this country has gone on the topic of applying the exclusionary rule as a remedy to a juvenile's right against self-incrimination—whether by

constitutional or statutory accord—when weighed against exigent circumstances emergently impacting the public's right to safety. Accordingly, I respectfully dissent.

I disagree with the majority opinion's suggestion that this case presents an issue of first impression relating to the scope of a juvenile's right against self-incrimination in the State of Missouri; rather, I believe this case requires us to evaluate the issue of what *remedy* may or may not be available to Missouri juveniles in circumstances such as those with which we are presented today. More specifically, the issue presented by this case is whether an unwarned statement, made by a juvenile in custody, in response to a limited question asked for the purpose of preserving public safety in the face of exigent circumstances, warrants suppression under either *Miranda v. Arizona*, 384 U.S. 436 (1966), or section 211.059.[1] I believe it does not.

## The Origin and Nature of *Miranda*

In *Miranda*, the United States Supreme Court "extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police." *New York v. Quarles*, 467 U.S. 649, 654 (1984). "The *Miranda* Court . . . presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *Id.* (footnote omitted). Accordingly, the *Miranda* decision created both a protection for the accused relating to Fifth

---

[1] Both the majority and concurring opinions repeatedly recite the anthem that "this case involves the interpretation and application of a state statute, not the constitutional principles developed in *Miranda v. Arizona*, 384 U.S. 436 (1966)." Clearly, such a suggestion is erroneous as juveniles in Missouri are entitled to *both* a statutory right under section 211.059 *and* a Fifth Amendment federal constitutional right; hence, the reason my dissenting opinion addresses *both* of these rights. What the majority and concurring opinions fail to recognize is that the real question on appeal is the applicability of the judicially created *remedy* at issue.

2

Amendment rights (presumption of coercion) and a remedy (suppression of unwarned statements). *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*."); *see also Patane*, 542 U.S. at 639 (noting that the *Miranda* presumption is "generally irrebuttable for purposes of the prosecution's case in chief").

"The prophylactic *Miranda* warnings[, however,] . . . are 'not themselves rights protected by the Constitution but [are] instead measures to [e]nsure that the right against compulsory self-incrimination [is] protected.'" *Quarles*, 467 U.S. at 654 (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)). Accordingly, "a simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment." *Elstad*, 470 U.S. at 307 n.1. Instead, it merely "affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." *Id.*

The Fifth Amendment contains its own exclusionary rule, in a sense, by precluding the use of compelled testimony: "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V. "The *Miranda* exclusionary rule, however, *serves* the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself." *Elstad*, 470 U.S. at 306 (emphasis added).

## The Impact of *Quarles* upon *Miranda* Warnings

In *Quarles*, a woman approached two police officers who were on road patrol, reported that she had just been raped, described her assailant, and told the officers that the man had just entered a nearby supermarket and was carrying a gun. 467 U.S.

3

at 649. After apprehending the suspect, one of the officers frisked the suspect and discovered that he was wearing an empty shoulder holster; thus, after handcuffing him, the officer asked the suspect where the gun was. *Id.* The suspect complied and the gun was recovered. *Id.* During the criminal prosecution, the defendant sought to have his incriminating statement to law enforcement about the gun suppressed since he had made the statement prior to receiving *Miranda* warnings. *Id.* The *Quarles* court proceeded to declare a "public safety" exception to the mandate of *Miranda*, noting:

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

> In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. *Here, had Miranda warnings deterred Quarles from responding to [the Officer's] question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. [The Officer] needed an answer to his question not simply to make his case against Quarles but to [e]nsure that further danger to the public did not result from the concealment of the gun in a public area.*

> We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. *We decline to place police officers such as [the arresting officer] in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions*

4

*without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.*

*Id.* at 657-58 (emphasis added).[2]  Subsequently, in *Dickerson v. United States*, the Supreme Court noted that modifications to *Miranda*, such as *Quarles*, "are as much a normal part of constitutional law as the original decision."  530 U.S. 428, 441 (2000). And, while the specific issue addressed by the *Quarles* Court was the scope of the *Miranda* protection ("[T]he only issue before us is whether [the officer] was justified in failing to make available to respondent the procedural safeguards associated with the privilege against compulsory self-incrimination since *Miranda*."), *Quarles*, 467 U.S. at 654-55 (footnote omitted), as the foregoing lengthy quotation denotes, the Supreme Court couched part of its analysis in *Quarles* by weighing the competing interests of a remedy (suppression of evidence) leading to "fewer convictions" versus the necessity to "ensure that further danger to the public did not result from the concealment of the gun in a public area."

Irrespective of the evaluation of J.L.H.'s federal constitutional "rights" or "protections" versus any corresponding "remedy," it is evident that the decision in *Quarles* precludes J.L.H.'s claim that suppression is warranted under *Miranda*.

---

[2] In the years since *Quarles* was decided, courts have broadened the exception's application, in the context of an in-custody adult, without regard to the immediacy of the purported public safety threat, and overwhelmingly apply the exception when the question asked pertains to the location of a firearm or whether the weapon is loaded.  Joanna Wright, Comment, *Mirandizing Terrorists?  An Empirical Analysis of the Public Safety Exception*, 111 Colum. L. Rev. 1296, 1325 (2011) (observing, based on a study of state and federal cases citing *Quarles* from 1984 to 2010, that the courts admit un-Mirandized statements relating to these questions some 80 percent of the time).  *See also* Alan Raphael, *The Current Scope of the Public Safety Exception to* Miranda *Under* New York v. Quarles," 2 N.Y. City L. Rev. 63, 70-71, 81 (1998) (concluding that a series of cases expanded the exception and thus, "it is always reasonable for police to inquire as to the location of weapons," "regardless of whether there exists an objective reason to believe that the particular suspect possessed or used same.").

5

Though J.L.H. was not given his *Miranda* warnings, despite being in custody when asked about the gun, the officers had every reason to believe that J.L.H. had recently discarded the weapon in a very public location with many children present; thus, the weapon posed an exigent threat to public safety. And that concern was "paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*." *Id.* at 653. Thus, the protection afforded by *Miranda* was not required.

## The Effect of Section 211.059

Although suppression was not warranted under *Miranda*, "[p]rocedures which would yield a constitutional confession from adults may not if the suspect is a juvenile." *State v. Jones*, 699 S.W.2d 525, 527 (Mo. App. E.D. 1985) (citing *Haley v. Ohio*, 332 U.S. 596 (1948)). In Missouri, section 211.059 speaks directly to the procedures required when *juveniles* are taken into custody.

> When a child is taken into custody by a juvenile officer or law enforcement official, with or without a warrant for an offense in violation of the juvenile code or the general law which would place the child under the jurisdiction of the juvenile court pursuant to subdivision (2) or (3) of subsection 1 of section 211.031, the child shall be advised prior to questioning:
>
> (1) That he has the right to remain silent; and
>
> (2) That any statement he does make to anyone can be and may be used against him; and
>
> (3) That he has a right to have a parent, guardian or custodian present during questioning; and
>
> (4) That he has a right to consult with an attorney and that one will be appointed and paid for him if he cannot afford one.

§ 211.059.1. Though the statute largely reflects the same warnings required by the *Miranda* decision, it is plainly broader than the *Miranda* decision insofar as it also

6

requires a warning that the juvenile "has a right to have a parent, guardian or custodian present during questioning." *Id.* Certainly, "states are free to provide greater protections in their criminal justice system than the Federal constitution requires." *State v. Whitfield*, 107 S.W.3d 253, 267 (Mo. banc 2003) (internal quotation omitted). Irrespective, the statute is independent of the *Miranda* decision, *State v. Burris*, 32 S.W.3d 583, 589 (Mo. App. S.D. 2000); thus, it must be analyzed independently.

Like *Miranda*, the mandatory warnings to Missouri juveniles in section 211.059 are absolute. Like *Miranda*, then, one might also reasonably assume that no such right or protection is, however, "immutable." *Dickerson*, 530 U.S. at 441.[3] Accordingly, I respectfully disagree with the majority opinion that the protection afforded juveniles in section 211.059 is without regard to any limitation whatsoever, even where exigent circumstances affecting the public safety and welfare are present. This court has previously noted as much in *State v. Tolliver*, 561 S.W.2d 407 (Mo.

---

[3] For example, "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. . . . The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger . . . ." *Schenck v. United States*, 249 U.S. 47, 52 (1919). "[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views whenever and however and wherever they please." *Wood v. Moss*, 134 S.Ct. 2056, 2066 (2014) (internal quotation omitted). "Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (holding that the right to bear arms "is not unlimited" and there are still "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualification on the commercial sale of arms."). *See also Dotson v. Kander*, 464 S.W.3d 190, 198 (Mo. banc 2015) (quoting *Heller*, 554 U.S. at 626-27). "First Amendment rights are not absolute under all circumstances. They may be circumscribed when necessary to further a sufficiently strong public interest." *Greer v. Spock*, 424 U.S. 828, 842-43 (1976) (Powell, J., concurring). "A defendant's right to present relevant evidence [pursuant to the Sixth Amendment] is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (footnote omitted). "Neither the right to refuse treatment nor the right to privacy are absolute . . . ." *Cruzan by Cruzan v. Harmon*, 760 S.W.2d 408, 419 (Mo. banc 1988). "Although cross-examination is a fundamental component of confrontation, it is not unlimited; limitation of cross-examination does not per se violate a defendant's right to confront the witnesses against him." *State v. Russell*, 625 S.W.2d 138, 141 (Mo. banc 1981).

App. 1977). In *Tolliver*, even when affirming the suppression of a juvenile's statement as taken in violation of section 211.059, the court contemplated some sort of exigent or emergency circumstances as an exception to the requirements of section 211.059, stating: "In considering this whole situation, *it is important to note that there was nothing of an exigent nature. . . . If there had existed an emergency situation*, much could be excused." *Id.* at 410 (emphasis added).[4] Not so coincidentally, the majority and concurring opinions ignore *Tolliver*.

That said, for the sake of argument, I am willing to proceed from the majority opinion's declaration that J.L.H.'s rights under section 211.059 were violated. I do so to point out that which has been ignored by the majority opinion: the judge-made remedy that the majority has engrafted upon section 211.059 (exclusionary rule) is, itself, subject to rules limiting its application—and when those rules are applied to the present situation, the exclusionary rule is clearly *not* appropriate here.[5]

---

[4] Though I believe it legally unnecessary, even the majority opinion—perhaps recognizing that it produces a result adverse to the best interest of the state—invites our legislature to entertain the idea of "chang[ing] section 211.059" to include specific reference to the fact that a Missouri juvenile's section 211.059 rights are subordinate to the public safety exception as announced in *New York v. Quarles*, 467 U.S. 649 (1984). If the Missouri Supreme Court fails to take transfer of this case to rectify what I believe to be an erroneous declaration of law by the majority opinion's ruling today, I join my colleagues in the majority opinion in inviting our legislature to clarify this topic relating to section 211.059.

[5] In other words, I believe the majority opinion has interpreted section 211.059's *silence* on the topic of any remedy to mean that the legislature intended for the exclusionary rule's application to be interpreted *broader* than our United States Supreme Court would permit. I am aware of no case in this state, or the country for that matter, that has interpreted a statute to be deemed to have broadened the exclusionary rule's application (*i.e.*, remedy) via silence on the topic; rather, if the legislature intends such a remedial result, I believe it must say so. Though the majority opinion may desire to infer by implication such additional words of remedy into section 211.059 in this case, appellate courts in this state "will not interpret a statute as a party wishes it were written," and we "will not add statutory language where it does not exist; this Court merely interprets the statutory language as written by the legislature." *Frye v. Levy*, 440 S.W.3d 405, 424 (Mo. banc 2014). "A court may not add words by implication to a statute . . . ." *Asbury v. Lombardi*, 846 S.W.2d 196, 202 n.9 (Mo. banc 1993). "[P]rovisions not plainly written in the law . . . should not be added by a court under the guise of construction to accomplish an end the court deems beneficial." *Smith v. McAdams*, 454 S.W.3d 418, 421 (Mo. App. W.D. 2015) (internal quotation omitted).

8

## Exclusionary Rule (*i.e.*, Suppression of Evidence)

Though section 211.059 is independent of the *Miranda* decision, like *Miranda*, it is obviously a prophylactic rule, designed as a means of protecting a juvenile's right against compelled self-incrimination.  And like *Miranda*, it reaches further than the consitutional right by providing greater protection for the accused.  But the fact remains that the statute is independent of *Miranda* and section 211.059 *provides no remedy within its statutory framework*.[6]  J.L.H. sought suppression of his statement as a remedy.  Accordingly, the real question of this case is whether the judicially created exclusionary rule should be applied in the circumstances of this case.

In large part, this is the point of divergence between the majority and concurring opinions and my dissent.  The majority and concurring opinions ignore that the only "writing in to the statute" in this case occurs when the majority and concurring opinions "write in" a remedy to a statute that contains none.  And in so doing, the majority and concurring opinions choose to "write in" the remedy of the exclusionary rule but believe it is a sound principle of jurisprudence to ignore United States Supreme Court precedent on the topic of when and how the exclusionary rule should be applied as a judicially crafted remedy in any situation—*statutory, constitutional rule, international treaty, or otherwise*—even though the United States Supreme Court judicially crafted the remedy in the first place.  I respectfully submit

---

[6] Had the legislature wished to expressly—and without limitation—exclude the usage of statements obtained in violation of section 211.059, it could have done so.  For example, in section 211.271.3, the legislature provided that "[a]fter a child is taken into custody . . ., all . . . statements by the child to the juvenile officer . . . are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."  But unlike section 211.271.3, the legislature did *not* impose limits on statements obtained in violation of section 211.059.  Thus, any remedy imposed must be judicially crafted.  And where our United States Supreme Court has not limited its analysis of the applicability of the exclusionary rule as a judicially crafted remedy to "constitutional rule" cases, *see Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349-50 (2006), why would we?

that this is an alarmingly dangerous precedent and one that I cannot support. Instead, I believe we must evaluate the precedent from the United States Supreme Court instructing us on how and when we may use the remedy of suppression and apply that precedent to the factual and procedural circumstances of this case, to-wit:

Like the Fifth Amendment, section 211.059 "says nothing about suppressing evidence obtained in violation of [its] command." *Davis v. United States*, 564 U.S. 229, 131 S.Ct. 2419, 2426 (2011).[7] "The question of whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question of whether the . . . rights of the party seeking to invoke the rule were violated by police conduct." *Illinois v. Gates*, 462 U.S. 213, 223 (1983).

Here, we are dealing with a statutory violation, rather than a constitutional one. But that does not preclude the use of the exclusionary rule, nor any accompanying discussion about what circumstances justify its use as a remedy. The United States Supreme Court has applied the exclusionary rule as a remedy for violation of a statute where the statute at issue implicated important Fifth Amendment interests. *See Miranda*, 384 U.S. at 463 (citing *McNabb v. United States*, 318 U.S. 332, 343 (1943)). But whether the exclusionary rule applies to statutory protections—like any other instance in which an unwarned self-incriminatory statement has been obtained by law enforcement—is governed largely by whether the *purposes* of the exclusionary rule would be served if applied to the statutory violation. *See Sanchez-*

---

[7] The majority opinion cites numerous opinions where Missouri courts have, indeed, judicially created the remedy of suppression for violation of juveniles' rights against self-incrimination (where the statute did not itemize such a remedy); yet, not a single one of those cases involved exigent circumstances emergently impacting the public's safety and welfare. Nor did any of those cases involve unwarned police questions expressly *limited* to finding a weapon that constituted a continuing and emergent threat to public safety. In my opinion, this is significant to any analysis evaluating the dual purpose of the exclusionary rule as a judge-made remedy, and as such, the cases cited by the majority opinion are inapposite to the case at hand.

10

*Llamas v. Oregon*, 548 U.S. 331, 349-50 (2006) (refusing to apply the exclusionary rule for officers' violation of Article 36 of the Vienna Convention, *i.e.*, not advising the suspect before questioning of his right to consular notification). Accordingly, one must discern whether the purposes of the exclusionary rule would be served by applying it to statements obtained from juveniles in violation of section 211.059 but for the purpose of protecting the public in exigent circumstances threatening public safety.

The exclusionary rule "serves two distinct purposes: preserving the integrity of the judicial system and deterring official misconduct." Michael H. Pryor, *The Exclusionary Rule*, 75 Geo. L.J. 845, 846 (1987). *See also Michigan v. Tucker*, 417 U.S. 433, 447-49 (1974). The United States Supreme Court has cautioned that courts must "maintain the closest possible fit between the Self-Incrimination Clause and any judge-made rule designed to protect it." *Patane*, 542 U.S. at 643.[8] Thus, if suppression of evidence obtained in violation of section 211.059 fails to serve the dual aims of the exclusionary rule (*i.e.*, the assurance of reliable evidence and

---

[8] In *Patane*, the suspect was questioned absent required *Miranda* warnings in a non-emergent setting about the location of .40 Glock pistol in his possession. *United States v. Patane*, 542 U.S. 630, 635 (2004). The Supreme Court held that even though there was little practical difference between the suspect's confessional statement (*i.e.*, statement as to the location of the gun in his home) and the actual physical evidence recovered (*i.e.*, the gun that was discovered where the suspect said it would be), "[i]ntroduction of the nontestimonial fruit of a voluntary statement, such as respondent's Glock, does not implicate the Self-Incrimination Clause," and the exclusionary rule was inapplicable to the recovered weapon. *Id.* at 643. Though the present case involves exigent circumstances affecting public safety, and thus, additional factors are present negating application of the exclusionary rule to J.L.H.'s statement to Sergeant Williams, the holding in *Patane* undercuts the majority opinion's suggestion that J.L.H.'s statement (*i.e.*, about the location of the gun) was the only evidence connecting him to possession of the gun. To the contrary, the record reflects that the gun was, not so coincidentally, recovered in exactly the path J.L.H. had taken in his flight from officers who had initially asked him to stop. Therefore, even *without* J.L.H.'s statement, the recovered gun in the immediate vicinity of J.L.H.'s path of attempted escape from law enforcement was alternatively sufficient to support the juvenile court's adjudication and disposition ruling. After *Patane*, there certainly is no rational basis for applying the judge-made exclusionary rule to the physical evidence (*i.e.*, gun) that was recovered after J.L.H. was in custody—whether by reference to protections guaranteed by *Miranda* or section 211.059.

11

deterrence of official misconduct), it does not meet the close-fit requirement and should not be applied.

### *Assurance of Reliable Evidence*

When "the right against compulsory self-incrimination [is] involved, [one of two] justification[s] for the exclusionary rule . . . [is] protection of the courts from reliance on untrustworthy evidence." *Tucker*, 417 U.S. at 448 (footnote omitted). Examples of compulsory self-incrimination "must, by definition, involve an element of coercion . . . often depict[ing] severe pressures which may override a particular suspect's insistence on innocence." *Id.* "Fact situations ranging from classical third-degree torture, to prolonged isolation from family or friends in a hostile setting, or to a simple desire on the part of a physically or mentally exhausted suspect to have a seemingly endless interrogation end, all might be sufficient to cause a defendant to accuse himself falsely." *Id.* at 448-49 (citations omitted).

While the prophylaxis of section 211.059, like *Miranda*, is designed to ensure that any incriminating statements given by a juvenile are not coerced (and thereby may be relied upon), the situations of coercion described in *Tucker* are a far cry from those presented here. Here, immediately after his unsuccessful flight from law enforcement on foot and after unwarned questioning posed to him *only* about the location of the weapon he had presumedly tossed in the path of his attempted escape, J.L.H. promptly told Sergeant Williams where he had tossed the gun.

As the Court in *Elstad* recognized, "[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced." *Elstad*, 470 U.S. at 310. The same can be said of statements obtained upon

12

a failure to warn in compliance with section 211.059. *See, e.g., State v. Barnaby*, 950 S.W.3d 1, 3 (Mo. App. W.D. 1997) (holding that the absence of a parent at a juvenile's interrogation does not "make[ ] a resulting statement illegal per se").

The simple fact that J.L.H. had not been warned in accordance with section 211.059 does not render his statement unreliable. In fact, the record demonstrates the contrary. "[T]he reliability of a single item of evidence often depends on other evidence, rather than being assessable in isolation." *Samuel v. Frank*, 525 F.3d 566, 570-71 (7th Cir. 2008). "[R]eliability may be established in corroboration, as when a . . . statement reveals a fact, say the location of the murder victim's body, that only the murderer could have known." *Id.* Here, J.L.H.'s statement was plainly reliable, as the loaded gun was discovered in the exact location where he indicated it would be and, not so coincidentally, in the path of his attempted escape from law enforcement officers who had been chasing him only minutes earlier. Accordingly, the purpose of excluding unreliable evidence would not be served in this context.

### *Deterrence of Official Misconduct*

The second rationale for applying the exclusionary rule is deterrence of official misconduct. *Tucker*, 417 U.S. at 447. But here, it is not clear that officers engaged in any intentional misconduct or that such misconduct would be deterred by application of the exclusionary rule in this context.

To begin, though the parties argue over whether *Officer Hill* knew that J.L.H. was a juvenile, the real issue is whether *Sergeant Williams*—the officer who asked J.L.H. where the gun was—knew that J.L.H. was a juvenile. Quite simply, there is nothing in the record indicating that Sergeant Williams knew that J.L.H. was a

13

juvenile. And in the absence of J.L.H.'s juvenile status, Sergeant Williams was clearly justified under *Quarles* in asking J.L.H. about the whereabouts of the gun. *See Berkemer v. McCarty*, 468 U.S. 420, 431 (1984) (holding that "[i]t would be unreasonable to expect the police to make guesses as to the nature of the criminal conduct at issue before deciding how they may interrogate a suspect."); *Davis*, 131 S.Ct. at 2429 ("[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. . . . The deterrent effect of exclusion in such a case can only be to discourage the officer from 'do[ing] his duty.'").

Requiring exclusion of evidence in this context would force officers confronting similar situations first to verify whether the suspect is a juvenile or adult, and doing so would hamper the public safety rationale for the questioning (of the location of the dangerous weapon) in the first place. The entire justification for bypassing the *Miranda* warnings in *Quarles* was the exigency of the circumstances and the need to protect the public's safety. Forcing officers to take additional time to verify whether a suspect is a juvenile before asking the limited public safety question only exacerbates the exigency of the situation.[9] Thus, the only thing to be deterred would be an officer's swift response to protect the public at large—that is, "discourag[ing] the officer from 'do[ing] his duty.'" *Id.* Accordingly, the deterrence rationale does not support exclusion.

---

[9] Limiting the availability of the *Quarles* exception when dealing with an adult suspect with a youthful appearance would be problematic because "a State may not impose . . . greater restrictions as a matter of federal constitutional law when [the Supreme] Court specifically refrains from imposing them." *Oregon v. Hass*, 420 U.S. 714, 719 (1975) (footnote omitted).

14

*Supression Serves Neither J.L.H.'s Welfare Nor the State's Best Interest*

Another aspect of this case that the majority and concurring opinions have ignored is that the present proceeding is *not* a *criminal* proceeding; rather, the present proceeding is a *civil juvenile delinquency* proceeding. The State of Missouri is not seeking to confine J.L.H. in a state penitentiary; instead, the State is attempting to treat and rehabilitate a troubled youth before the "sins of his youth" permanently scar the hope for his future. This, I believe, is a distinction with a difference and bears relevance on the discussion of the topic of what *remedy* best serves both J.L.H.'s welfare and the State's interest in guiding J.L.H. away from a life that may lead to a criminal court.

Herein lies another problem I find with the majority and concurring opinions relying so heavily upon *State v. Wade*, 531 S.W.2d 726, 729 (Mo. banc 1976), and *State v. Arbeiter*, 408 S.W.2d 26, 29-31 (Mo. 1966). Reliance upon those cases overlooks a vital distinguishing factor: both *Wade* and *Arbeiter* were *criminal* prosecutions, and not *civil juvenile delinquency proceedings*.

This distinction is important because it changes the perspective and purpose of both the juvenile and the court. In *Wade* and *Arbeiter*, the juveniles were not in the position of delinquent children; instead, they stood before the court as criminal defendants, subject to punishment through incarceration. Though minors when they committed their crimes, Wade and Arbeiter were adults in the eyes of the law, and the court's duty was to ensure a just sentence for their crimes. In *J.L.H.*, however, the juvenile stood before the juvenile court as a misguided youth in need of treatment and rehabilitation, and the juvenile court's duty was to help reform the child and guide

15

him back to a law-abiding course of life so that he did not end up being another criminal defendant.

"The purpose of . . . chapter [211] is to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court. This chapter shall be liberally construed, therefore, to the end that each child coming within the jurisdiction of the juvenile court shall receive such care, guidance and control *as will conduce to the child's welfare **and** the best interests of the state . . . .*" § 211.011 (emphasis added). According to the statute, there are two interests at play in juvenile cases: the child's welfare *and* the best interests of the state. In light of those interests, it is difficult to see how suppression of J.L.H.'s response to a question posed solely to protect the safety of the public is an appropriate response insofar as suppression fails to serve either interest identified.

As I have pointed out previously, section 211.059 provides no remedy for a violation of its mandates. Though suppression has been sought and applied in juvenile cases, both case law and the Juvenile Code itself recognize that suppression may not serve the juvenile's welfare insofar as suppression of statements, generally, in the juvenile case runs counter to the rehabilitative purposes of the Juvenile Code.

Section 211.271.3 provides that, "[a]fter a child is taken into custody . . . all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel . . . are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, *other than proceedings under this chapter*." (emphasis added). "[T]he underlying policy and purpose of § 211.271(3) is to allow a juvenile to discuss his problems with

16

the juvenile officer in a relaxed, non-adversary, confidential setting freely, openly and without fear in order that the juvenile officer and juvenile court personnel may attempt to aid the youth in his rehabilitation." *State v. Ross*, 516 S.W.2d 311, 320 (Mo. App. 1974). "If the purpose and underlying policy of the statute is to be meaningful, and a youth is to be encouraged to discuss his problems freely so that juvenile court personnel may be in a better position to aid the juvenile, we believe that not only the statement made to the juvenile officer, but also physical evidence obtained thereby, such as the gun here, which is not otherwise discoverable from an independent source should also be inadmissible *except in the juvenile court system*." *Id*.

Though suppression was an appropriate remedy in both *Wade* and *Arbeiter*, those cases were criminal, not juvenile, cases. Conversely, because we want to encourage open communication in juvenile cases in order to facilitate the juvenile's rehabilitation, applying the suppression remedy in a juvenile case such as this one makes little sense.

"The purpose of the Juvenile Act is *not* to convict of criminal offenses but is to safeguard and reform erring children . . . ." *In re C*, 314 S.W.2d 756, 760 (Mo. App. 1958) (emphasis added). "A delinquency hearing, therefore, is *not* a '*criminal* case,' as it does not charge the juvenile with the commission of a crime, even though the conduct alleged against him may be the violation of a criminal law." *State ex rel. R.L.W. v. Billings*, 451 S.W.2d 125, 127 (Mo. banc 1970). "It is but the assertion of the state's power, parens patriae, for the reformation of a child and not for his punishment under the criminal law." *Id*. "[F]rom the moment a child commits an

offense, in effect he is exempt from the criminal law unless and until the Juvenile Court waives its jurisdiction." *Harling v. United States*, 295 F.2d 161, 163 (D.C. Cir. 1961) (footnotes omitted).[10] And "[i]t is . . . because children are, generally speaking, exempt from criminal penalties that safeguards of the criminal law, such as . . . the exclusionary . . . rule, *have no general application in juvenile proceedings*." *Id*. (emphasis added).

In addition to the welfare of the juvenile, the Juvenile Code is also designed to consider the best interests of the State. "[T]he state, as parens patriae, - the community, - society, - has an interest . . . to protect the public from possible injury . . . ." *State ex rel. Wilkerson v. Skinker*, 126 S.W.2d 1156, 1161 (Mo. 1939). Clearly, it is in the public's best interest that law enforcement officers be permitted to ask public safety questions without risking suppression. The rationale in *New York v. Quarles*, 467 U.S. 649 (1984), was that "concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*." *Id*. at 653. Accordingly, the suppression of J.L.H.'s statement in response to the public safety question also fails to protect the best interests of the State.

In short, even if *Wade* and *Arbeiter* may be read to require suppression as the remedy for violations of the Juvenile Code, that remedy was in the context of subsequent *criminal* prosecutions, not *civil* juvenile delinquency adjudications. And

---

[10] Though the Missouri Supreme Court opted not to follow *Harling* in *State v. Arbeiter*, 449 S.W.2d 627, 633 (Mo. 1970), it did so because it believed that our statute (§ 211.271.3) provided for a different rule. (*Harling* required absolute exclusion of juvenile statements in subsequent criminal proceedings, while the Missouri Supreme Court determined in *State v. Wright*, 515 S.W.2d 421 (Mo. banc 1974), that—under certain circumstances irrelevant here—a juvenile's statement could be used in criminal court.) The Court ultimately agreed with much of the rationale in *Harling*. *Arbeiter*, 449 S.W.2d at 633 ("The considerations of 'fundamental fairness' alluded to in *Harling* do not permit the state, in the harsh adversary arena of the criminal courts, to take advantage of the procedures and attitudes which it promotes under the Juvenile Code.").

even then, neither case accounted for the exact scenario present in this case—where the unwarned statement was made in response to a public safety question involving exigent circumstances. *Arbeiter* specifically left other scenarios open: "We are, of course, determining only the question here presented. We do not consider the question of spontaneous statements by a juvenile prior to being taken before the juvenile judge or juvenile officer; nor do we consider statements of a juvenile in response to questioning after § 211.061 has been complied with." *Arbeiter*, 408 S.W.2d at 31. Thus, neither *Wade* nor *Arbeiter* mandate suppression *in this case*.

## *Conclusion as to Applicability of the Exclusionary Rule*

In short, neither purpose of the exclusionary rule would be served by its judge-made remedial application in the context of the purported violation of J.L.H.'s section 211.059 rights. Likewise, neither purpose of the Juvenile Code would be served by suppressing J.L.H.'s statement to law enforcement about the location of a gun that posed an exigent threat to the public's safety. The only purpose served by applying the exclusionary rule here would be to say that, though the need for answers to questions in a situation posing an exigent threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination for adults in a *criminal* court context, it does not outweigh derivative statutory requirements (*i.e.*, § 211.059) in the context of a Juvenile Code designed to openly address the troubles of youth in a *civil* juvenile delinquency proceeding. The result is to elevate a procedural protection for a delinquent juvenile—who is not subject to criminal penalties—over the safety of the general public, which here included many innocent children and adults. Such a result ignores

19

the purpose of the Juvenile Code, ignores the purpose of the exclusionary rule, and is fraught with dangerous practical ramifications to law enforcement performing its duty in exigent circumstances affecting the public's safety. Accordingly, I do not believe the exclusionary rule should be applied as a judge-made remedy—under section 211.059—for J.L.H. in this case.[11] *See Sanchez-Llamas*, 548 U.S. at 349 ("[T]he reasons we often require suppression for Fourth and Fifth Amendment violations are entirely absent [in this case].").

---

[11] I have located thirteen other states across the country with statutes codifying *Miranda* warnings to juveniles in similar fashion to Missouri: Alabama, Colorado, Connecticut, Indiana, Kansas, Montana, New Hampshire, New York, North Carolina, New Jersey, Texas, Washington, and West Virginia. Of these states, none has interpreted its statute to expand the boundary of the exclusionary rule as a remedy for violation of its juvenile *Miranda* statute as the majority opinion has done in the instant case. Instead, where exigent circumstances involving public safety were present and a juvenile was questioned without warning as to the whereabouts of the weapon involved, those states have *not* applied the exclusionary rule to the juvenile's unwarned statements. *See, e.g., In Re Cy R.*, 841 N.Y.S.2d 25, 28 (N.Y. App. Div. 2007); *State In Interest of A.S.*, 548 A.2d 202, 205-06 (N.J. Super. Ct. App. Div. 1988) ("Even if [the juvenile] was in custody when he was questioned and when he led the police to the gun, the concern for public safety must be paramount to adherence to the literal language of the prophylactic *[Miranda]* rules[.]"). And although the State of Iowa does not have a similar juvenile *Miranda* statute, its Supreme Court's commentary on a juvenile's rights relating to custodial questioning is apropos when it states that the rights of juveniles "do not exist in a vacuum" and must be balanced with the rights of the public to be protected against exigent threats to the public. *In re J.D.F.*, 553 N.W.2d 585, 588-89 (Iowa 1996). *See also Commonwealth v. Dillon D.*, 863 N.E.2d 1287 (Mass. 2007) (holding juvenile's possession of over fifty bullets alone was enough to support the inference that a gun was in close proximity and unwarned statements were permissible because the obligation of protecting other students and the community outweighed juvenile's rights to be questioned in the presence of juvenile's parents or other interested adult); *In re Roy L.*, 4 P.3d 984 (Ariz. Ct. App. 2000) (holding that unwarned questions of a juvenile about a gun in his possession while in a public area near a high school were permissible to protect the public from exigent circumstances affecting the public's safety).

20

# Conclusion

I would affirm the juvenile court's ruling denying J.L.H.'s motion to suppress and would affirm the juvenile court's adjudication and disposition ruling.[12]

_____
Mark D. Pfeiffer, Judge

---

[12] The substance of my dissent is a response to the majority opinion's ruling as to Point I of J.L.H.'s appeal. As the majority opinion notes, its ruling as to Point I is dispositive of the result the opinion proposes. As I propose the opposite result, Points II and III are relevant to my discussion of what the result of this case should be.

In Point II, J.L.H. argues that he was arrested without probable cause. I disagree. Because "[a] *de facto* arrest occurs for Fourth Amendment purposes when the officer's conduct is more intrusive than necessary for an investigative stop," *State v. Wickerham*, 28 S.W.3d 401, 403-04 (Mo. App. E.D. 2000) (internal citation omitted), I believe the facts of this case are such that a reasonable person in J.L.H.'s position would have understood he was under *de facto* arrest. And, while a *de facto* arrest must be based on probable cause, "[p]robable cause exists when the arresting officer is aware of facts and circumstances that are reasonably trustworthy and would lead a person of reasonable caution to believe an offense had been committed." *State v. Pfleiderer*, 8 S.W.3d 249, 256 (Mo. App. W.D. 1999). "Probable cause [to arrest] does not mean absolute certainty. . . . Much less evidence is necessary to establish probable cause than is required to establish guilt . . . ." *State v. Tackett*, 12 S.W.3d 332, 339 (Mo. App. W.D. 2000) (internal quotation omitted). "While flight alone does not establish probable cause, it can supply the key ingredient justifying the decision by a law enforcement officer to take action." *State v. Smith*, 11 S.W.3d 733, 739 (Mo. App. E.D. 1999) (internal quotation omitted). Here, J.L.H.'s *de facto* arrest was not based solely on his flight from the officers. The officers had an accurate description of a juvenile wearing certain distinctive clothing and being armed with a gun. J.L.H. matched that description. When J.L.H. was approached by officers, first he fled, then he failed to stop when instructed to do so, and then he tried to evade officers by ducking behind a car (out of sight), running down a hill, and jumping on a sidewalk along Brush Creek. It was not until an officer drew his weapon and ordered J.L.H. to "Stop" once again that J.L.H. got down on the ground. These circumstances provided probable cause for the officers to effect a *de facto* arrest of J.L.H.

As to Point III, I note that J.L.H.'s argument is patently illogical and contrary to his own admission—or rather assertion both before the juvenile court and this court—that he was entitled to the protection of section 211.059—a statute that is *only* applicable to *juveniles*. "'A judicial admission is an act done in the course of judicial proceedings that concedes for the purpose of litigation that a certain proposition is true.'" *Dawson v. Dawson*, 366 S.W.3d 107, 115 (Mo. App. W.D. 2012) (quoting *Moore Auto Grp., Inc. v. Goffstein*, 301 S.W.3d 49, 54 (Mo. banc 2009)). "A judicial admission waives or dispenses with the production of evidence and concedes for the purpose of the litigation that a certain proposition is true." *Peace v. Peace*, 31 S.W.3d 467, 471 (Mo. App. W.D. 2000) (internal quotation omitted). Simply put, J.L.H. cannot be heard to argue that he is a juvenile entitled to the statutory protections of section 211.059 that are only afforded to juveniles, but then take the position that the Juvenile Officer has failed to adduce evidence that he is, in fact, a juvenile. J.L.H.'s judicial admission as to his juvenile status concedes for the purpose of this litigation that he is a juvenile.

Thus, I propose to affirm the juvenile court's adjudication and disposition because all three of J.L.H.'s points on appeal are without merit.

21